NO. 84--

C O U R T   O F   A P P E A L

P A R I S H   O F   O R L E A N S

----

WILSON & COMPANY INC. OF LA

VS.

CRESCENT TRANSFER & SHIPPING CO INC.

----

Dinkelspiel; J.

This suit/ claims damages, in that plaintiff
avers that the defendant company through its driver of an auto
truck travelling North or toward downtown in Burgundy Street,
the said truck of defendant being then about sixty or eighty
feet removed from the intersection of Lafayette Avenue, when
petitioner's wagon was in the act of crossing said street.

Alleging further that while the said vehicles were in
the respective positions as aforementioned the defendant's truck
driver endeavored to force the same ahead of petitioner's wagon
as it was crossing the said street intersection and the speed of
defendant's said truck being accelerated for that purpose.

That under the circumstances it becomming apparent to
the driver of plaintiff's wagon that a collision was
imminent, said driver attempted to avoid same by swerving his
mules to the left into Burgundy Street, but that despite this
action on his part the defendant's truck struck the mule on the
right of rear side of petitioner's said wagon, as the result of
which the leg of said mule was broken, and it became necessary
to kill him at the time of the accident; that the value of the
mule was $275.00, the wagon was damaged in the sum of $34.50 and
three dollars paid for the services of the veterinarian.

Alleging further that the collision and damage herein
complained of was due solely and entirely to the negligence of
the party driving defendant's automobile truck in that the said
party failed to timely exercise the duty of "lookout" in that he
failed to give the right of way to petitioner's wagon as it start-
ed across the street intersection and that he failed to avail him-
self of the last clear chance to avoid the collision and drove
the truck at a high and negligent rate of speel.

The answer of defendant denies that it is responsible
for the damage incurred and goes on (Art. 3) to allege that
"Admits that when the collision was imminent and at a time when

480

it could not be avoided that plaintiff's driver did attempt to avoid it; further alleging that the said accident was due wholly to the fault and negligence of ~~paxixx~~ plaintiff's driver who attempted to cross Burgundy Street in such close proximity to the truck of respondent that it was impossible to avoid striking the said mule, notwithstanding every effort made by defendant's chauffeur and that had the driver of said wagon stopped and looked as he should have done, he would have seen the truck of respondent in time to have avoided an attempt to pass when the proximity of the truck made it impossible for the wagon to pass in safety. And finally defendant alleges that when the mules and wagon had crossed in Burgundy street or were near the intersection of the two streets that it was impossible for the chauffeur of defendant's truck to see him and had the driver of the wagon not attempted to cross at a time when it was impossible to do so without being struck, the said collision would not have occurred.

In behalf of plaintiff there were examined three witnesses, Joseph Harris, Patrick A. McGill and John E. Scott.

Harris testified that he was the driver of plaintiff's wagon involved in this collision at the intersection of Lafayette Avenue and Burgundy Street in this City on March 18th. 1920; that he was in the act of crossing Burgundy Street in the direction towards the river; the truck was coming down Burgundy Street and that he was driving the wagon to which were attached two mules; he points out on the photographs annexed the exact spot where he first saw the truck and states he was in the middle of Burgundy Street and that he was about fifty feet from the truck when he first saw it right in the center of Burgundy Street and his mules were walking and he saw the truck coming in the curve and saw that they were going to be hit, he swung his mules to the left and he did'nt try to stop, he speeded and he did'nt have room enough and when he cut short defendant's truck hit him and got tangled in his front wheel dragging him to ten or twelve feet

481

and threw both mules to the ground. One of the mules was so
badly injured/that he was subsequently killed and there was some
slight damage to the wagon, the pole being broken.

On Cross examination amongst other things:

Q. And it is a fact, where you were, when you say that you start-
ed across that you had a clear view of Burgundy Street?

A. No I had a clear view of about fifty feet until the curve cut
it off straight up.

Q. You could have stopped your mules?

A. Yes but if I stopped there was no room for him to pass.

Mr. McGill another witness for plaintiff who witnessed the accid-
ent at the time alleged, testifies that he was standing right on
Lafayette Avenue and Burgundy Street in the garage.

Q. State to the Court, what, briefly is your observation of that
occurrence?

A. I was standing right in the garage door facing Burgundy Street
ah you can see about ninety feet up Burgundy Street, there is a
very bad curve there; plaintiff's wagon was going out Lafayette
Avenue, and it was about half way in the middle of the street
of Burgundy Street, going towards the river, on Burgundy Street,
the truck coming down Burgundy Street had plenty of time and suf-
ficient time to check up and avoid hitting that animal, he could
not get across to swing his mules to go down Burgundy Street, and
this truck struck the mule's leg just above the fetlock, between
the hoof and knees and the animal stood and could'nt move; the
driver of the truck never stopped after hitting the animal for
fully ninety feet down Burgundy Street, I went after him. Be-
ing shown a sketch of the scene of the accident he was
asked if same was correct and whether the curve into Burgundy
Street is as sketch shows up toward the river.

A. The curve is up Burgundy towards Canal; you have got to go
around that curve to go down.

Q. Suppose a wagon comes along going towards the point described

482

as X, is it not a fact that being between the point Y and the
point X he could look up Burgundy Street in the direction of
Canal Street and see anything coming down?
A. He could.

The witness Scott knows nothing of the accident save
and except the value of the mule, damage to the wagon, amount
paid to the veterinarian.

Witnesses for the defendant were B$_a^3$ Wiggins, Jules H.
Caulfield, Charles Gatden, James Perkins.

Wiggins testifies:

Q. Where you on a truck of the Crescent Transfer Company which
had a collision with a wagon of Wilson & Company at Burgundy
Street and Lafayette Avenue?

A. Yes Sir.

He was employed by the Custom House in the scaling
department and going to the Army Base to get scales, sitting in
the middle of the trailor and going about ten or twelve miles
and seated on the left hand side a being the Woods side and
was looking towards downtown, the way they were going.

Q. Did you see the mules and wagon approaching the truck on Bur-
gundy Street?

A. Yes, I saw them when they started to cross.

Q. About how far from the corner of Lafayette Avenue was the
truck when the wagon started to cross Burgundy Street?

A. I think they both started across at about        the same
time.   There are three streets coming in there, you can't tell
very well the corner.

Q. When the wagon started across Burgundy Street did the wagon
have time enough to cross in safety ahead of the truck?

A. No, he didn't.

Q. When did the driver of the wagon first stop or try to stop
his mules?

A. To my knowledge he didn't try to stop; I didn't see him draw
his lines at all.

Q. Suppose that when the truck was fifteen or twenty feet away from the point of accident, the man had stopped his mules, did he have time enough to do that?

A. Yes he had time enough to do that.

Q. He swung over to his right in an effort to pass ahead of the mules.

A. The mules were still coming along and he kept to the right hand side.

Q. He went over to the extreme right hand side to pass the mules?

A. I suppose it was in an effort to pass the mules.

Q. What time of the day was this?

A. It was after lunch, we had lunch at the Custom House and went right down; I can't give you the exact time.

Jules A. Caulfield, witness for the defendant testifies:

Q. Where were you at the time of the collision?

A. I was sitting on the truck, we were going to the Sugar Refinery after some scales. I was sitting on the trailer behind the motor, and this was on of Wilsons, coming out of the direction of Lafayette Avenue ran into the wagon and hit the mules. The wagon was trying to pass this truck; we were going at the rate of eight miles because when you get to Lafayette in the junction of Music Street, you have to slack for the curve; there is a water trough, and I don't know whether he came from the water trough, but he tried to pass us, and he could'nt.

Q. Was he walking or trotting.

A. No, on a little gallop,

Q. Was there anything at that time to obstruct his view as he reached the lower part of Burgundy Street, so as to prevent him seeing the truck coming down?

A. Nothing was in his way but the truck.

Q. When he attempted to cross in front of the truck, about how many feet away from the truck at that time was he from the point of collision?

A. Right in the middle, midships, in the middle of the crossing

484

there is Music Street on one side and Lafayette Street on the other, and on this side of the Street, and we were going in the center of the street when he hit us.

Reading of this witness's testimony on cross-examination in no wise changes in our opinion his evidence on direct examination.

Mr. Charles Gatden testifies:

He is employed at the Customhouse as one of the weigher's assistants, scale man, was on the truck when it collided with the mules attached to a wagon belong to Wilson & Company and was going to get some scales, left the Custom House about lunch time, was sitting kxxkhxxkxxikxx on the front seat on the right river side going down, its a great big long truck, open and could see what was going on on the opposite side; the driver is in front, he is closed in, he is sitting in front and the truck is something like a wagon, the trailor is hitched to where the driver is The rear part of the trailer is the highest.

Q. When was the first time you saw this wagon and these mules; how far from the point of the accident when you first saw them?

A. When I first saw the wagon it was coming in from one of those streets, I am not familiar with those streets down there; I think it was Lafayette Avenue, I think he was coming in as we were passing by.

Q. At what speed was this wagon trying to cross Burgundy Street; how were the mules going?

A. Trosting.

Q. When they started to cross the street down which your truck was coming how far was your truck from the point of collision?

A. The head of the truck was past and this wagon came in and struck the middle portion of the truck on the left side.

Q. At the speed at which your truck was going was/there tkxkx time enough for the wagon to stop in front of it?

A. No, the head part afxkk had done crossed over when this wagon came.

485

On cross examination.

Q. You didn't see this wagon until it went into the side of your truck?

A. No, I saw the wagon coming and the driver blew the horn before coming to the corner, and he crossed over, and the next thing I knew it came into us.

James Perkins, another witness for the defendant testifies:

Q. Were you on one of his trucks at the time when it collided with some mules belonging to    a Wilson & Company at Lafayette Avenue and Burgundy Streets.

A. Yes Sir.

Q. In what part of that truck were you sitting?

A. I was sitting in front with the driver.

Q. At about what speed was that truck going down Burgundy Street?

A. About 8 to 9 miles an hour.

Q. When was the first time you saw the wagon?

A. We were on Burgundy Street, you see, one side is Music Street and the other Lafayette Avenue, we were going across and the wagon looked to me like about ten to fifteen feet from us, and the driver pulled up his mules and just as we crossed Lafayette Avenue the wagon was on the other side of the gutter and I heard a lick, and they hollered, and the driver stopped, we got down and came back and looked and saw the mule crippled, and the pole was broke, and it hit right in the side of the last wheel on the side of the truck.

Q. Was there anything when he reached the lower property line of Burgundy Street to keep him from seeing that truck coming down?

A. No there was nothing it was a clear street.

He was seated with the chauffeur, was on the right side and/was
the wagon
crossing                Burgundy Street when he first saw it.

Q. When you first saw the wagon it was in the act of going across Burgundy Street?

A. Yes it was going that way.

486

Q. There is a bend in Burgundy Street as you come downtown where you xxx have to turn to the right?

A. Yes.

A careful examination of the evidence in this case goes to show that drivers must obey the rules and laws of the road and there is in this evidence an ordinance, No. 5181 Commission Council Series, which distinctly gives the right of way and Section 3 page 3 speaking of wagons and trucks and other vehicles and describing xixxxxixxxxxi streets and avenues of the city of New Orleans and the direction which drivers must take goes on and thus states:

"On all other streets and at intersections of above streets and avenues, all vehicles shall have right of way over other vehicles approaching on intersection streets from the left and shall give right of way to those approaching from the right."

And this rule of the/Qixy Commission Council in our opinion, governs this case.

It has been frequently decided both by this Court and the Supreme Court that "the driver of a vehicle upon the wrong side of a street assumes the risks of a collision with another vehicle unless he can show that the party inflicting the injury could have avoided doing so by reasonable care."

Jacob Fabacher vs. L. Blum, No. 8116/Syllabus of this Court's decision in that case.

And to the same effect is the case of Boston Insurance Company vs. Howard N. Moody, where the syllabus reads "A chauffeur who disregards the provisions of the traffic ordinance and thereby brings on a collision and damage upon the automobile he drives is guilty of negligence which debars the owner of the damaged automobile from recovering damages." This is found in No. 7891 of the docket of this Court, and there cited amongst other authorities applicable to this case, is the case of Schick vs. Jenevein, 145 La. at page 334, quoting from the syllabus:

"The law of the road requiring that a driver shall turn

to the right when meeting another upon the public highway is not an inflexible one, but must be followed unless circumstances and common prudence dictate a different course.

Where one is upon the wrong side of the traveled portion of a road or has not conceded to the other party whom he has attempted to pass that portion of the highway to which he is entitled, and an/~~axxxdaxx~~ collision occurs, the burden is upon him who so violates the rule to show that his act was not the proximate cause of the injury, or that there were justifiable circumstances which excuses his conduct."

If in this case the driver of the wagon had followed the rules of the road this accident would not have occurred; in failing to do this he has brought about the result himself and the defendant cannot be held responsible for his gross negligence and violation of the traffic ordinance.

For the reasons assigned it is ordered, adjudged and decreed that the judgment of the Court aqua be and the same is hereby reversed,/costs of both Courts to be paid by the plaintiff. and this suit dismissed,

Judgment reversed.